Gibson *v.* Toby.

---

## GIBSON *vs.* TOBY & BOOTH.

In order to make the receiving of the note of a third person, by a vendor, from the vendee, a payment of the price, there must be an agreement between the parties that such note shall be taken by the vendor in payment for the property sold.

When the sale and delivery of the property and the transfer of the note are at the same time, a *presumption* arises that the parties agreed to an exchange of property; that is, that the vendor should sell and deliver his property for the note to be transferred by the other party; and the agreement being executed, the note is taken at the risk of the party taking it for his property.

The fact of a simultaneous exchange is the evidence from which the agreement is *presumed.* But this presumption is not conclusive. The party taking the note may show that it was not the agreement that he should take the note at his own risk, in exchange for his property.

If the debt exists at the time the note or draft of a third person is transferred, an agreement is required that it shall be payment. The *onus* of showing this is upon the debtor. By proving an express agreement that his creditor should take the note of a third person in payment of the debt, he proves an accord, and by adding the proof of the delivery to, and acceptance by, his creditor, he proves the satisfaction.

Where, by an agreement for the sale of hogs, payment of the price was to be made in cash, and the hogs having been weighed, the agent of the purchasers, expressed a desire to ship them at once, saying he had not time to pay them, but a third person would see that the vendor was paid, to which the vendor assented, and such agent thereupon drove the hogs to a railroad cattle yard and shipped them on the cars; *Held* that this was a delivery, and the purchasers became the debtors of the vendor, and were bound to pay the price in cash; unless there was a further agreement between the parties.

And the only subsequent agreement being that an eastern draft should be given to the vendor, by the vendees, as good to him as the money, or better

than money; *Held* that the delivery to, and acceptance by the vendor, of an eastern draft, drawn by a third person, for the price, which proved to be worthless, was not a payment of the debt.

What will be deemed due diligence on the part of the vendor, in giving notice to the purchasers, of the dishonor of a draft thus taken for the price of the property sold.

APPEAL from a judgment entered on the report and decision of a referee. The action was to recover the balance of the price of hogs sold. The plaintiff resided in Mexico, Wyandotte county, Ohio. One of the defendants resided in New York city, and the other in Chicago, and they had a place of business in each of those cities. On the 1st of November, 1867, between 8 and 10 o'clock A. M. the plaintiff sold to the defendants, in Buffalo, hogs, the price amounting to $3408.07. The sale was for cash. The hogs were all weighed between 9 and 10 A. M. when Thomas Pienkowskie, the agent of the defendants, expressed a desire to ship the hogs right away, and said he had not time to pay the plaintiff then, but that William Hogle would see that he was paid. The plaintiff assented, and Pienkowskie then drove the hogs to the Erie railroad cattle yard and shipped them on the cars. About an hour after this, the plaintiff saw Hogle and inquired if he was to pay for the hogs, and Hogle said he was, and asked if the plaintiff wanted to use the money then, or would carry it home. The plaintiff told Hogle that he was going directly home and would carry the money with him. Hogle inquired what train, noon or night, and the plaintiff said night train. Hogle said he would see that the plaintiff had it all in time; that currency was rather hard to obtain up town; that if the plaintiff was going home he could get him an eastern draft which would be as good to him as the money; that the banks preferred giving these drafts to currency. The plaintiff said such a draft would answer him as well as the money. Hogle said when he got leisure he would go up to town and get

Gibson *v.* Toby.

the draft for the plaintiff, and bring it to him in time for his leaving. This conversation was at the Erie railroad cattle yards, about three miles from the banks. About an hour after this, the plaintiff met Pienkowskie at the hotel at the New York Central cattle yard, and they mentioned what the hogs came to, and agreed upon the sum, and P. said they would have to go up town to get the money to pay the plaintiff; that if the plaintiff wanted the money he could get the currency; if the plaintiff wanted to carry it home he could get him an eastern draft, which would be just the same to the plaintiff as money, and he would get for the plaintiff just which he chose. The plaintiff said he would full as soon carry a draft as the money, and for safety, rather; and P. said he would go up town and get the draft and bring it in time. Soon after this, P. and Hogle drove up and said they were going to arrange the matter for the plaintiff; and Hogle inquired the initials of his name, saying he would get the draft payable to his order. The plaintiff told him. About 2 o'clock they returned, and told the plaintiff they had him all fixed right now, and P. handed him the odd dollars, and asked the plaintiff if that was right, and the plaintiff said it was; and P. then handed him the draft, and said, "here is the draft for $3200." The plaintiff took the draft, saying he supposed it was all right; and Hogle said : "Yes, that is all right," and Pienkowskie said, " Yes, it is better than the money; it cost him one eighth to get it." The plaintiff took the draft. When P. and Hogle spoke to him about taking a draft, they did not say whose draft it was to be. The plaintiff did not read the draft. The parties to the draft were strangers to the plaintiff, and he knew nothing of their circumstances. This was on Friday the 1st day of November. The plaintiff took the cars and got home the next day, at 5 o'clock P. M. and called at the bank in his place. It was closed. Mon-

day morning, at 9.30, he delivered the draft to the bank, with instructions to place it to his credit. The draft was returned from New York, on the 10th, protested on the 6th November, and the plaintiff took it up. The draft was made by the banking house of H. J. Shuttleworth, Buffalo, and was payable to the order of the plaintiff and indorsed by him, and by the cashier of the bank of Tiffin, for collection. The banker, Shuttleworth, suspended payment November 4, in the forenoon, in Buffalo and New York. He did no business on that day. He telegraphed to New York on the morning of the 4th to pay none of his drafts. His drafts, to the close of business, on Saturday, were paid. A mail was made up in Buffalo at one o'clock P. M. which arrived in New York at 7.30 the next morning. Another mail was made up at 4 P. M. that would arrive at New York at one o'clock P. M.

On the 15th of November, the plaintiff presented the draft in Buffalo to Pienkowskie, and asked him to pay $3200 for it. P. said he could not do it. The plaintiff learned, at the time he sold the hogs, where the defendants lived. On the 5th day of December the draft was offered to one of the defendants and its amount demanded. He refused to pay, and thereupon this action was commenced.

Upon the motion of the defendants, the referee nonsuited the plaintiff.

The referee decided, as matter of law, that the delivery to, and acceptance by, the plaintiff of the draft was a payment. Second, if not a payment, that the defendants were discharged by the laches of the plaintiff, in giving notice to the defendants of the dishonor of the draft.

*Parker & Chamberlain,* for the plaintiff.

*George B. Hibbard,* for the defendants.

Gibson *v.* Toby.

*By the Court,* MARVIN, P. J. The facts being ascertained, I do not understand that there is any dispute touching the law applicable to cases of the sale of property and the receiving of the note of a third person by the vendor, from the vendee. If the agreement expressly is that the note of a third person shall be taken for the property sold, and the property and note are delivered, the transaction is an exchange of property. It was said by the court, in *Johnson* v. *Weed,* (9 *John.* 310,) "that the books all agree that there must be a clear and special agreement that the vendor shall take the paper absolutely as payment, or it will be no payment, if it afterwards turns out to be of no value."

In *Whitbeck* v. *Van Ness,* (11 *John.* 409, 410,) the court say that the opinion went further than the judges meant to go. Spencer, J. examines a large number of cases, and among them *Ward* v. *Evans,* (2 *Ld. Raym.* 928,) which he approves. In that case there was a precedent debt, and a note of a third person had been taken. Lord Holt said, "that taking a note for goods sold is a payment, because it was a part of the original contract; but paper is no payment when there is a precedent debt. For when such a note is given in payment, it is always intended to be taken under the condition, to be payment if the money be paid thereon in convenient time." As I understand, there must be an agreement between the parties that the note of the third person shall be taken by the vendor in payment for the property sold. When the sale and delivery of the property and the transfer of the note are at the same time, a *presumption* arises that the parties agreed to an exchange of property; that is, that the vendor should sell and deliver his property for the note to be transferred by the other party, called the vendee, and the agreement being executed, the note is taken at the risk of the party taking it for his property. The fact of a simultaneous exchange is the evidence from which the agreement is *presumed.* This presumption is not conclusive. The party taking

the note may show that it was not the agreement that he should take the note at his own risk, in exchange for his property. In *Whitbeck* v. *Van Ness*, (*supra,*) the lease and the note were delivered at the same time, and in addition it was proved that the defendant offered to buy the lease if the plaintiff would take the note, and the plaintiff accepted the offer, and the exchange was made.

In case the debt existed at the time the note is transferred, an agreement is required that it shall be payment. The *onus* of showing this is, of course, upon the debtor. He owed the debt, and must show it satisfied. By proving an express agreement that his creditor should take the note of a third person in payment of the debt, he proves an accord, and by adding the proof of the delivery to, and acceptance by, his creditor, he proves the satisfaction. (*See Noel* v. *Murray*, 3 *Kern.* 168.)

The question in the present case is, was the relation of debtor and creditor established between the parties prior to the negotiations touching the draft, and did such relation exist at the time the draft was taken? If this question was answered in the affirmative, then the question will be, was there an express agreement that the draft should be taken in payment of the debt. The referee must have found the first question in the negative, or the second question in the affirmative. He does not find the fact directly, but "decided as matter of law that the delivery to and acceptance by the plaintiff of said draft was a payment." As the referee nonsuited the plaintiff he must have been of the opinion that the evidence did not tend to prove a prior indebtedness, or that it proved an express agreement to take the draft in payment. I think the learned referee erred. It seems to me that the evidence clearly showed the relation of debtor and creditor prior to any negotiation touching the draft. By the agreement of sale, payment was to be made in cash. The hogs were weighed between 9 and 10 o'clock. The agent of the de-

Gibson v. Toby.

fendants expressed a desire to ship the hogs right away, saying he had not time to pay then, but Hogle would see that the plaintiff was paid, and the plaintiff assented, and the agent drove the hogs to the Erie railroad cattle yard and shipped them on board the cars. This was a delivery. The defendants became debtors, and the plaintiff could have maintained an action against them for the price of the hogs. The plaintiff had a right to insist upon payment in cash. It may be that he also had the right to repossess himself of the hogs if the cash was not paid, as no credit was to be given; but he was not bound to adopt that remedy. The delivery had been made, and the defendants were his debtors. The debt must be paid in cash, unless there should be a further agreement between the parties. A further agreement was made, and the question now is, was it an express agreement that the draft in question should be taken by the plaintiff in satisfaction of the debt?

It seems to me that the evidence did not show that such was the character of the agreement. The *onus* was upon the defendants. Let us again examine this evidence. Starting with the position that the plaintiff was the creditor of the defendants, the defendants, by their agent, approach him, and learn that he is going directly home, and intends taking the money with him. He was then told that currency was rather hard to obtain; that an eastern draft could be got that would be as good to the plaintiff as the money; that the banks preferred giving drafts to giving currency. The plaintiff assented to the taking of a draft.

There was a subsequent conversation with Pienkowskie, in which P. proposed to get currency or a draft, as the plaintiff should choose; saying, if the plaintiff wanted to carry it home he could get the plaintiff an eastern draft which would be just the same to the plaintiff as money. The plaintiff remarked that he would full as soon carry a draft as the money, and for safety, rather. When the

draft was handed to the plaintiff by Pienkowskie, the latter said "here is the draft for $3200." The plaintiff took it, saying he supposed it was all right; and Hogle said, "Yes, it is better than the money; it cost me one eighth to get it." The plaintiff took the draft without reading it. Nothing had been said as to whose draft was to be obtained. It seems to me that this evidence does not prove that the plaintiff entered into an agreement with the defendants to take the draft in question at his own risk, in payment of the debt then due him. On the contrary, if it proved any agreement, other than that which the law would imply, viz. in the language of Holt, Ch. J. that "it is always intended to be taken under the condition, to be payment if the money be paid thereon in convenient time," it proved an agreement that an eastern draft should be given to the plaintiff, as good to him as the money, or better than money. No other kind of draft was talked of. The plaintiff exercised no judgment touching the goodness of the paper, and legally he was not bound to do so. The defendants owed him and were bound to pay him, and they handed him a draft declaring that it was better than money. (*See Torry* v. *Hadley,* 27 *Barb.* 192.) I think the referee erred in deciding that the delivery to, and acceptance by the plaintiff of the draft was a payment.

If the debt was not paid by the draft, were the defendants discharged by the laches of the plaintiff in giving notice to the defendants of the dishonor of the draft? No point is made that there was any negligence in sending the draft forward and presenting it to the drawees for payment. It was understood that the plaintiff was to take the draft with him, to his home in Ohio. Due diligence was used in sending the draft to the drawees. (*Stevens* v. *McNeill,* 26 *Barb.* 651.) What duty did the plaintiff owe to his debtors? Their names were not upon the paper. The paper was presented for payment, which was refused, and notice was given to the indorsers, and I infer to the

Gibson *v.* Toby.

drawer, though this does not very clearly appear in the case. The drawer, however, can raise no objection, as he had directed the drawees not to pay any more of his drafts, prior to the presentation of this draft. The sole point is that the plaintiff was guilty of laches in not notifying the defendants of the dishonor of the bill. Upon this point, the counsel for the defendants cites *Dayton* v. *Trull,* (23 *Wend.* 345,) and *Woodcock* v. *Bennet,* (1 *Cowen,* 711.) · These cases are not in point. The holders of the bills neglected to present them for payment, and the persons from whom they were received were the drawers. There were some other circumstances. In one of the cases, BRONSON, J. says the drafts should at least have been produced and canceled on the trial, or it should have been shown what had become of them.

In the present case the plaintiff did, some five days after he received notice of the dishonor of the drafts, go to Buffalo and then tender to Pienkowskie the draft, and ask him to pay its amount. This was November 15. On the 5th of December the money was demanded of the defendants and the drafts offered to him with the notarial certificate of protest. The action was thereupon commenced. This is not a case where the party has made the paper his own by negligence.

The learned referee erred, and the judgment should be reversed, and there should be a new trial; costs to abide the event.

[ERIE GENERAL TERM, February 8, 1869. *Marvin, Lamont* and *Barker* Justices.]